USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/3/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                    :
UNITED STATES OF AMERICA               :

                    -v-                               :             16-cr-441 (LJL)

ROBERT RUSSO,                              :             ORDER

                Defendant.
------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Robert Russo is 64 years old. He suffers from asthma, chronic obstructive pulmonary disease, diabetes and diabetic ulcers, coronary heart disease, hypertension, degenerative retinal condition, irritable bowel syndrome, acid reflux, and prostate issues. Unable to control his urine flow, he is dependent on diapers. Mr. Russo has been imprisoned for three years, nine months, and 25 days. He has six months left in his sentence.

      Mr. Russo is incarcerated because, from February 2012 through May 2016, he engaged in a scheme to rob or swindle livery cab drivers. As part of the scheme, Mr. Russo would often tell a driver that he needed money to pay a courier. When a driver would not willingly pay, Mr. Russo would sometimes take the money by threats of force or use of force. This scheme was not Mr. Russo's first endeavor into criminal activity. He had 37 convictions at the time of his sentencing and had served lengthy terms of imprisonment for robbery. Mr. Russo has struggled long term with drug addiction, for which he has never received effective treatment.

      The Government keeps Mr. Russo detained at Metropolitan Correctional Center ("MCC") in downtown New York City. As of Wednesday, the Director of the Bureau of Prisons ("BOP") ordered implementation of Phase 5 of its COVID-19 Action Plan. The Action Plan purportedly

assures that, for a 14-day period, inmates will be "secured in their assigned cells/quarters to decrease the spread of the virus." Bureau of Prisons, *COVID-10 Action Plan: Phase Five*, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (Mar. 31, 2020). According to Mr. Russo's representations, at MCC, inmates have limited access to even the most basic protective supplies—soap, water, clean laundry. At MCC, Mr. Russo competes with approximately 700 other inmates for the attention of two in-house doctors. Nearly one-third of MCC's current population is, like Mr. Russo, defined by the CDC as "high-risk" for contracting COVID-19. Centers for Disease Control and Prevention, *People who are at higher risk for severe illness*, https://bit.ly/2R3z0AY; *see also* Centers for Disease Control and Prevention, *People with Moderate to Severe Asthma*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html ("People with moderate to severe asthma may be at higher risk of getting very sick from COVID-19. COVID-19 can affect your respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease."). It is alleged that many inmates at MCC have already been exposed to COVID-19 by an inmate who tested positive and was housed on an open-dorm unit with many of the at-risk inmates.

In an affidavit attached to Mr. Russo's motion, Dr. Brie Williams, M.D., a Professor of Medicine at the University of California, San Francisco in the Geriatrics Division, explains that, "[b]ecause inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19." Inmates "share small cells" and "use the same bathrooms and sinks." "Some are not given tissues or sufficient hygiene supplies" and "[e]ffective social distancing in most facilities is virtually impossible."

Mr. Russo asks the Court for compassionate release. Through counsel, he transmitted the same request to the warden of MCC on March 27, 2020. The BOP has yet to rule on his request. The

parties agree that this is not a case where the inmate should be sent home. The home to which he would go, in New Jersey, houses his mother, who is in her late eighties. The parties agree that Mr. Russo's potential exposure to COVID-19 at MCC would pose a danger to her heath. Mr. Russo asks instead to be sent to a halfway house.

On Wednesday, the Court heard oral argument on Mr. Russo's motion. Immediately afterwards, the Court asked the Government to submit a letter by 4:30 p.m. on Thursday advising when the BOP will make a final determination on the request by Mr. Russo's counsel that it make a motion for compassionate release. The Government's letter stated that the BOP is "unable to give a specific time frame, but that it will endeavor to expedite its response."

**Applicable Law**

"A court may not modify a term of imprisonment once it has been imposed except pursuant to statute." *United States v. Gotti*, 2020 WL 497987, at *1 (S.D.N.Y. Jan. 15, 2020). 18 U.S.C. § 3582(c) permits courts to modify an imposed term of imprisonment. Specifically, in relevant part,

> The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction

3

. . .

>and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

*Id.* This is a recent addition to the United States Code, enacted as part of the First Step Act in December 2018. *See Gotti*, 2020 WL 497987, at *1 ("Until last December, a court could not modify a defendant's duly-imposed sentence on compassionate release grounds unless it received a motion from the Bureau of Prisons asking that the court consider such modification.").

### Eligibility for Compassionate Release

The Court discerns from the statutory text two sometimes competing congressional objectives. First, the language recognizes that the BOP is frequently in the best position to assess, at least in the first instance, a defendant's conditions, the risk presented to the public by his release, and the adequacy of a release plan. That recognition is consistent with one of the bedrock principles underlying administrative exhaustion—to permit the agency, with its expertise and with its responsibility over the movant, to make a decision in the first instance. *See, e.g.*, *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992) ("[T]he exhaustion doctrine recognizes the notion, grounded in deference to Congress' delegation of authority to coordinate branches of Government, that agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer. Exhaustion concerns apply with particular force when the action under review involves exercise of the agency's discretionary power or when the agency proceedings in question allow the agency to apply its special expertise."). The Court is undoubtedly aided by the fruits of administrative review—when the agency is able to provide it timely.

At the same time, permitting a defendant to seek judicial relief within 30 days of making a request to the facility's warden unquestionably reflects congressional intent for the defendant to have the right to a meaningful and prompt *judicial* determination of whether he should be released. After

all, in our system, it is the sentencing court—not the BOP, or any other agency—that is charged with considering the Section 3553(a) factors and determining what kind of sentence is consistent with the purposes of the criminal law. *See, e.g.*, *United States v. Booker*, 543 U.S. 220 (2005). Furthermore, at the time the First Step Act passed, a 30-day period before which to seek judicial review would have seemed exceptionally quick. No one anticipated today's circumstances, where each day that goes by threatens incarcerated defendants with greater peril. In essence, the 30-day rule was meant as an accelerant to judicial review. The Court is charged with interpreting congressional intent and it would pervert congressional intent to treat it as a substantial obstacle to effective judicial review.

This is a hard case—one among hundreds that the BOP and courts nationwide are handling at this very moment. It is made harder by the tragic paradox that if conditions somewhere outside the MCC are better, then transferring an exposed inmate into those conditions could threaten the safety of those already there; if they are worse, then transferring an inmate there would harm that inmate himself. The Court defers ruling on the motion for the time being, including on the Government's argument that Mr. Russo must exhaust administrative remedies or wait 30 days before the Court can reduce his sentence. It does so to afford the BOP an opportunity to craft the response that it endeavors to "expedite," and to give that agency a chance to address the difficult questions presented by the parties' submissions.[1]

The Government is HEREBY ORDERED to submit a letter immediately following any determination the BOP makes on Mr. Russo's request for compassionate relief. If no such letter is

---

[1] Nothing in the agency's internal procedures for implementing the compassionate release statute suggests that it cannot complete its review process, including any appeal, extremely quickly. *See* BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. The procedures contemplate that the warden should consult an inmate's unit manager, correctional counselor, and other relevant staff (social worker, physician, psychologist, etc.). With today's technology, and particularly at this unique time when no one should be traveling, and given the exigent circumstances presented by this application, such conversations should be able to happen in a day or two. Moreover, relevant medical and disciplinary information is already in BOP's possession.

sent by **April 13, 2020 at 12:00 p.m.**, the Government shall submit a status letter (by that same time) updating the Court on when the BOP will make a final determination. In the interest of expedition, by **April 13, 2020 at 12:00 p.m.**, counsel for Mr. Russo shall submit language for a proposed modification of Mr. Russo's sentence requiring him to serve the remainder of his sentence at a halfway house.

SO ORDERED.

Dated: April 3, 2020
      New York, New York

_____
LEWIS J. LIMAN
United States District Judge