**Federal Defenders OF NEW YORK, INC.**

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director
and Attorney-in-Chief*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

April 3, 2020

**VIA EMAIL & ECF**
Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: United States v. Robert Russo**
**16 Cr. 441 (LJL)**

### EMERGENCY MOTION FOR COMPASSIONATE RELEASE

Robert Russo, through undersigned counsel, respectfully moves the Court under 18 U.S.C. § 3582(c)(1)(A)(i) to modify his sentence and immediately release him to home detention, or order his referral to a halfway house, and a period of supervised release. We respectfully request this motion be filed under seal due to the sensitive health information enumerated herein. This case was originally assigned to the Honorable Deborah A. Batts. The unprecedented threat of COVID-19 could not have been foreseen at sentencing, and poses extraordinary risks to Mr. Russo's health. The virus thrives in densely packed populations, and the MCC is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for Mr. Russo. Mr. Russo's advanced age of 64, and his numerous serious health conditions, which include but are not limited to ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████, make him especially

vulnerable to the deadly risks of COVID-19.  Allowing Mr. Russo to finish out his sentence at home or at a halfway house is the only prudent response to the extraordinary and compelling circumstances created by the novel coronavirus, especially given that he only has remaining slightly over 6 months of a 60 month sentence.

Attached for the Court's consideration in connection with this motion are two expert affidavits, one that generally addresses the increased public health risks from keeping at-risk inmates incarcerated during the pandemic (Affidavit of Dr. Brie Williams, attached as Exhibit A); and one that specifically addresses the conditions in the MCC (Affidavit of Dr. Jonathan Giftos, attached as Exhibit B).

## I.     Procedural History.

On October 18, 2018 the Honorable Deborah A. Batts sentenced Mr. Russo to a term of imprisonment of 60 months.  He has been incarcerated since June 9, 2016.  His projected release date is October 6, 2020.

## II.    Mr. Russo's Current Conditions of Confinement and Health Conditions.

Mr. Russo is particularly vulnerable to COVID-19 because he falls squarely within the Centers for Disease Control and Prevention's ("CDC") "high-risk" category.[1] Mr. Russo suffers from multiple health conditions which the CDC considers to be high-risk conditions: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, all of which on their own would be enough to designate Mr. Russo as high-risk. In addition to this confluence of high-risk conditions, his age places him at-risk as well. Mr. Russo will be 65 in October.

---

[1] Centers for Disease Control and Prevention, *People are at higher risk for severe illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html

As enumerated above, Mr. Russo suffers from a range of health conditions, in addition to these high-risk conditions, which have required continuous medical treatment during his time in BOP custody. Mr. Russo has been repeatedly transported out of the MCC New York, to receive treatment and undergo operations at outside hospitals. One of these such operations, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

### III. Under the First Step Act, this Court has Broad Authority to Determine Whether Extraordinary and Compelling Circumstances Exist to Modify Mr. Russo's Sentence and Release Him to Home Confinement.

The First Step Act ("FSA") expressly permits Mr. Russo to move this Court to reduce his term of imprisonment and seek compassionate release. *See* 18 U.S.C. § 3583(c)(1)(A)(i). Under normal circumstances, a defendant can seek recourse through the courts after either (1) the BOP declines to file such a motion on his behalf; or (2) there has been of lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier. *Id.* On March 27, 2020, counsel transmitted Mr. Russo's request to the warden of MCC via email. Although the BOP has yet to rule on the request (and thirty days have yet to pass), Mr. Russo files this motion now in light of the urgent nature of this matter. *See* discussion, *infra* Part III. A.

After exhausting the administrative process, "a court may then 'reduce the term of imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Ebbers*, 2020 WL 91399, at *4, 02-CR-1144 (VEC) (ECF No. 384) (S.D.N.Y. Jan. 8, 2020). "In making its decision, a court must also consider "the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable."" *Id.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

While courts have noted that the Sentencing Commission's applicable policy statement on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA, they still continue to be guided by the Sentencing Commission's descriptions of "extraordinary and compelling reason." *See, e.g.*, *Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020). However, the Sentencing Commission's statements do not constrain the court's independent assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction in light of the First Step Act's amendments. *United States v. Beck*, 2019 WL 2716505, at *5–6 (M.D.N.C. June 28, 2019); *see also Ebbers*, 2020 WL 91399, at *4. Indeed, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) (collecting cases).

### A. The unprecedented nature of this emergency compels the Court to find the exhaustion requirement waived.

The Court need not and should not wait for Mr. Russo to exhaust administrative remedies under § 3582(c)(1)(A), as this will almost assuredly exacerbate an already impending public health catastrophe in our jails and prisons, while posing a particular and real danger to Mr. Russo. *See generally Washington v. Barr*, 925 F.3d 109, 120–21 (2d Cir. 2019) ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile.").

Federal courts have found that they can hear applications prior to the expiration of 30 days (or the exhaustion of administrative remedies) if there is an emergency. *See United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT), ECF Docket No. 642 (D. Mass. Mar. 17, 2020) (granting defendant's emergency motion based on COVID-19); *see also United States v. James Arberry*, No. 15 Cr. 594 (JPO), ECF Docket No. 84 (S.D.N.Y. Nov. 12, 2019) (hearing

and granting emergency compassionate release application of prisoner with cancer). This accords with general administrative law principles and the exception to administrative exhaustion requirements in numerous statutory schemes.  *See, e.g., Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (waiving requirement to exhaust administrative remedies where "exceptional circumstances of peculiar urgency are shown to exist") (*citing Granberry v. Greer*, 481 U.S. 129 (1987)); *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019) (finding that administrative exhaustion requirements can be waived if delay would cause irreparable injury); *Maxwell v. New York Univ.*, 407 F. App'x 524, 527 (2d Cir. 2010) (same).

"[A]pplication of the exhaustion doctrine is 'intensely practical'" and should "be guided by the policies underlying the exhaustion requirement."  *Bowen v. City of New York*, 476 U.S. 467, 484 (1986) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 n.11 (1976)).  Those policies were articulated by the Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749 (1975):

> Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

422 U.S. at 765.

Conducting an "intensely practical" analysis of these policies in the context of the Social Security Act's exhaustion requirement, the Supreme Court held in *Bowen* that courts "should be especially sensitive" to irreparable and severe medical harm resulting for blind adherence to a statutory exhaustion requirement, particularly "where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place."  476 U.S. at 484 (discussing 42 U.S.C. § 405(g)); *see also Rafeedie v. I.N.S.*, 880 F.2d 506 (D.C. Cir. 1989) (Ginsburg, J., concurring) ("As I see it, a statutory exhaustion requirement, unless Congress explicitly declares otherwise, does not impose

an absolute, unwaivable limitation on judicial review; instead, it sets a condition that may be excused when insistence on exhaustion would threaten grave harm to the party seeking review and would not sensibly serve the purposes Congress envisioned in establishing that condition.").

When coupled with the impending crisis, the unique exhaustion provision in § 3582(c)(1)(A) places this case squarely within *Bowen*'s holding. Under § 3582(c)(1)(A), exhaustion will "merely [ ] enable [Defendants] to receive the procedure they should have been afforded in the first place"—it will simply advance by what could be a crucial thirty days this Court's consideration of Mr. Russo's motion for compassionate release. *Bowen*, 476 U.S. at 484. To wit, § 3582(c)(1)(A) provides that motions for compassionate release are to be brought *either* by the "Director of the Bureau of Prisons, *or* upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . ." 18 U.S.C. § 3582(c)(1)(A) (emphasis added). In other words, § 3582(c)(1)(A)'s exhaustion requirement is not like other statutory exhaustion requirements, which expressly deprive federal courts of jurisdiction to hear disputes in the absence of exhaustion. *Cf. Booth v. Churner*, 532 U.S. 731, 736 (2001) (failure to exhaust under the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), means action cannot be maintained in federal court because that provision explicitly provides that "*[n]o action shall be brought* with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." (emphasis added)).

Rather, § 3582(c)(1)(A) merely controls who (the BOP or the Defendant) moves for compassionate release before the Court, and when (now, or long after COVID-19 has already swept through MCC).

Congress' desire to avoid blind adherence to this "exhaustion" requirement is evidenced by the exception baked into § 3582(c)(1)(A), which provides that Defendants can bypass exhaustion altogether if the warden fails to act on an administrative application for compassionate release within 30 days. § 3582(c)(1)(A) ("[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility*, whichever is earlier . . . ." (emphasis added)). With this provision, Congress implicitly recognized that the policies underlying compassionate release are not furthered—and, indeed, actively frustrated—by excessive deference to bureaucratic process. Congress' concerns about delay are even more pronounced in the current public health crisis.

The policies underlying such requirements would not be furthered by strict adherence in this instance. Giving the BOP time to decide administrative applications for compassionate release predicated on COVID-19 concerns would not "afford the parties and the courts the benefit of [the BOP's] experience and expertise." *Salfi*, 422 U.S. at 765. The BOP already has provided its "expert" input on such requests: its "COVID-19 Action Plan" lacks any consideration whatsoever of compassionate release. *See* Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. And the MCC Legal Department has confirmed to counsel that it has no institution-specific requirements for requesting compassionate release and no specific procedure in place for compassionate release during this pandemic. Thus, it would be futile to force defendants to exhaust their administrative remedies—at the cost of their health and, potentially, their lives.

As discussed below, it is only a matter of time before COVID-19 spreads like wildfire in

the prisons.  As one Court held on March 19th:

> The Court is glad to hear that there are currently no reported cases of COVID-19 at Maguire, but is unsure what that means if people are not being tested.  And, as the [prison's] management plan itself acknowledges, symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up.  That's why the Bay Area is on lockdown.  We don't know who's infected.  Accordingly, the government's suggestion that Toledo should wait until there is a confirmed outbreak of COVID-19 in Maguire before seeking release, *see* ECF No. 113 at 6 ("If the situation with respect to COVID-19 at Maguire changes, Toledo is free to seek reconsideration of the issue at that point."), is impractical.  By then it may be too late.

*In the Matter of the Extradition of Alejandro Toledo Manrique*, 2020 WL 1307109, at *1, 19-MJ-71055 (MAG) (TSH) (N.D. Cal., Mar. 19, 2020).

With the speed and unpredictability of this pandemic in New York City—now the epicenter of the pandemic—waiting even 30 days will be too late.  Accordingly, this Court should exercise jurisdiction over Mr. Russo's emergency motion for compassionate release and dispense with the BOP requirements under 18 U.S.C. § 3582(c)(1)(A)(i).

### B. "Extraordinary and compelling reasons" warrant a reduction in Mr. Russo's sentence.

#### 1. COVID-19 is a public health disaster that threatens vulnerable incarcerated persons like Mr. Russo.

The COVID-19 pandemic continues to roil New York City.  As of March 25, 2020, New York had over 30,000 confirmed positive cases, with almost 18,000 of those cases in the city, and the number is projected to double every three days, with the city deemed an "epicenter" of the crisis.[2]  COVID-19 is already sweeping through the city's jails and prisons, too.  As of March 25, 2020, at least 52 inmates and prison employees at Rikers Island and other city jails had tested positive for COVID-19.[3]  Federal facilities are not immune: the BOP has confirmed at least one

---

[2] *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times, *available at* https://nyti.ms/2UIkCz4.

[3] Sydney Periera, *Confirmed Coronavirus Cases Rise in New York Jails, Increasing Pressure to Release People in Custody*, *available at* https://gothamist.com/news/confirmed-coronavirus-

inmate case and five staff cases at MDC Brooklyn. At the MCC New York there are at least four positive inmate cases, and at least three units are under quarantine while test results are pending for symptomatic inmates from these units.[4] The numbers are likely higher, as testing is limited. *See, e.g.*, *In the Matter of the Extradition of Manrique*, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (expressing concern about the infection rate within BOP facilities given that "people are not being tested"). A number of other inmates are in isolation or quarantine at both MDC Brooklyn and MCC New York.

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19. *See* Affidavit of Dr. Brie Williams, attached at Aff. ¶ 14 ("Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons. Inmates share small cells, eat together and use the same bathrooms and sinks. . . . . They are not given tissues or sufficient hygiene supplies"); Joseph A. Bick (2007). *Infection Control in Jails and Prisons. Clinical Infectious Diseases* 45(8):1047-1055, at https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"). BOP employees are complaining that they lack masks and gloves, hand sanitizer, and even soap.[5] Pretrial detention centers—like

---

cases-rise-nyc-jails-increasing-pressure-release-people-custody.

[4] Federal Bureau of Prisons, COVID-19 Coronavirus, *available at* https://www.bop.gov/coronavirus/index.jsp.

[5] *Federal Prison Workers Say Conflicting Orders on Coronavirus Response is Putting Lives at Risk*, *CBS News* (March 19, 2020), *available at* https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/; Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, N.Y. Times (Mar. 17, 2020), *available at* https://www.nytimes.com/2020/03/17/us/coronavirusprisons-jails.html;

MCC—are even more imperiled, as detainees transit through weekly. *See* Williams Aff. ¶ 13 ("The risk of exposure is particularly acute in pre-trial facilities where the inmate populations shift frequently"). Despite the general lockdown in New York State, BOP continues to transport inmates to and from MDC and MCC and has confirmed, on March 25, 2020, that it will not stop admitting new inmates.[6] This exacerbates the risk of transmission. Though the BOP emphasizes that it screens inmates before moving them,[7] as the *Manrique* Court put it: "the [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . . We don't know who's infected." *Manrique*, 2020 WL 1307109, at *1.[8]

The MCC has disclosed that as of March 25, 2020, nearly one-third of its current population is high-risk within the CDC's definition (205 inmates), creating a powerful likelihood that the coronavirus will spread throughout the facility, and particularly endanger the at-risk inmates, many of whom were already exposed to the virus by an inmate who tested positive and was housed on an open dorm unit with many of the at-risk inmates.

MCC employees have also reported that the facility is currently operating with *less than*

---

Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators.'*" NPR (March 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

[6] Luke Barr, *Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transporting Inmates: Sources*, ABC News (March 23, 2020), https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416%22;

[7] BOP Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp
[8] In fact, according to information the BOP provided to the U.S. Marshals Service, the positive case at MDC Brooklyn came from a new inmate who had left Rikers on March 16, 2020, was brought to MDC Brooklyn that evening, and passed all of MDC Brooklyn's screening tests. He became symptomatic two days later and was sent to Lutheran Hospital for testing, and returned to the MDC Brooklyn to await the results. Between March 16, 2020 and when the positive test result was received on March 21, 2020, this inmate had contact with many other inmates and with correctional officers.

*half of its usual number of correctional officers*—and MCC is already severely understaffed.[9] According to one MCC employee, there is almost no potential quarantine space for sick inmates.[10]  Speaking days before the first MCC case was confirmed, the employee said "[o]nce that whole thing spreads, no staff is going to come into work."[11]  According to Southern District of New York Judge Alison Nathan, "in the event of an outbreak at [MCC], substantial medical and security challenges would almost certainly arise." *United States v. Dante Stephens*, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020).

Moreover, and notably, MCC currently has only two doctors available to provide medical care for approximately 700 detainees.  *See* Affidavit of Dr. Jonathan Giftos, attached, at Aff.  ¶ 16.  The facility's horrendous conditions and lack of appropriate medical care for detainees have been the subject of numerous, recent exposés.[12]  MCC has also been the subject of numerous lawsuits. *See, e.g.*, *Rivera v. Fed. Bureau of Prisons*, 368 F. Supp. 3d 741, 743 (S.D.N.Y. 2019); *Rodriguez v. Warden, Metro. Corr. Facility*, 2015 WL 857817, at *2, 13-CV-3643 (PAC) (S.D.N.Y. Feb. 27, 2015).  In the context of this unprecedented and rapidly evolving emergency, it is unsurprising that MCC is utterly ill-equipped to provide adequate medical attention to sick detainees.

In fact, an MCC inmate who has already tested positive and those inmates who are

---

[9] Cassidy McDonald, "Federal Prison Workers Say Conflicting Orders on Coronavirus Response is Putting Lives at Risk," *CBS News* (March 19, 2020), *available at* https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/.
[10] *Id.*
[11] *Id.*

[12] Jeanne Theoharis, *I Tried to Tell the World about Epstein's Jail. No One Would Listen*, *The Atlantic* (August 16, 2019), *available at* https://www.theatlantic.com/ideas/archive/2019/08/real-scandal-mcc/596257/; Aviva Stahl, *Prisoners endure a nightmare gulag in lower Manhattan hidden in plain sight*, The Gothamist (June 19, 2019), *available at* https://gothamist.com/news/prisoners-endure-a-nightmare-gulag-in-lower-manhattan-hidden-in-plain-sight.

symptomatic are currently being held in isolation on Tier G of 9-South in the Solitary Housing Unit at MCC.  The conditions of confinement in Tier G have been well-documented:[13] these cells were built to house the 9/11 defendants facing trial in the Southern District of New York, and consist of a stone bed, an open toilet, and a sink.  The bed is not adjacent to any wall, and the tier is under the stairs and always cold and damp.  Maintaining one's health and sanity in such a cell is difficult at the best of times, let alone when one is suffering from a respiratory illness so debilitating and life-threatening as COVID-19.   Locked in a damp dark room lying on a stone bed while one is feverish, experiencing diarrhea, and gasping for breath is beyond any sentencing consequence this Court imposed or could have contemplated.

### 2. Mr. Russo's vulnerability to COVID-19 due to his high medical risk is an extraordinary and compelling reason that warrants a sentence reduction.

Mr. Russo is particularly vulnerable to COVID-19, as the BOP has already acknowledged by placing Mr. Russo on the list of high-risk inmates, due his numerous high-risk conditions.  This is an "extraordinary and compelling reasons" for his release.  *See* Note 1(A), § 1B1.13 (expressly recognizing that "other reasons" may exist for granting compassionate release), *see* Note 1(D), § 1B1.13 Note 1(D) (recognizing that extraordinary and compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C).").  Here, Mr. Russo's high susceptibility to COVID-19 falls within the purview of this catchall.  Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there.  Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release.

---

[13] *Id.*

Given the highly infectious nature of COVID-19, the inability in a facility like MCC to practice any of the hygienic and social distancing techniques that the CDC has put in place to prevent rapid transmission, and the fact that Mr. Russo suffers from ailments that have already been identified as "high risk," this Court should find that Mr. Russo's legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

A recent letter by fourteen U.S. senators of both parties underscores this position. Writing to U.S. Attorney General William Barr and BOP Director Michael Carvajal, they stated: "[We] urge you to take necessary steps to protect [inmates in Federal custody] particularly by using existing authorities under the First Step Act (FSA). . . . We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to protect the most vulnerable staff and inmates. . . . [I]t is important . . . that the most vulnerable inmates are released or transferred to home confinement, if possible."[14] And as the Second Circuit noted about COVID-19 in a unanimous recent opinion, "The impact of this recent emergency on jail and prison inmates, their counsel . . . , the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present information strongly suggests, however, that it may be grave and enduring." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

Finally, in the last few days, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the incarcerated population and thus

---

[14] https://www.durbin.senate.gov/imo/media/doc/Letter.%20to%20DOJ%20and%20BOP%20on%20COVID-19%20and%20FSA%20provisions%20-%20final%20bipartisan%20text%20with%20signature%20blocks.pdf

reduce the risk of spread. For example, on March 25, 2020, New York City announced that it would release 300 inmates from Rikers Island.[15] Approximately 1,700 inmates have been released from Los Angeles County Jails,[16] and 1,000 inmates are to be released from New Jersey jails.[17] Therefore, while COVID-19 remains an unprecedented emergency, many states (and politicians) have recognized that they have a duty to flatten the curve inside incarcerated spaces. So, too, should this Court.

### IV. Mr. Russo Has A Stable Home To Live In, if Released To Home Detention, Where He Will Be Safer and The Public Will Be Safer.

Mr. Russo hopes to spend the time of home detention with his mother who lives in New Jersey, but in the alternative, the Court may refer him to spend a period of time in a halfway house to complete his sentence. If released into home detention or placed in a halfway house, Mr. Russo will be able to practice the CDC's recommended safety measures that he is simply unable to while in a correctional setting. As already stated, at the MCC Mr. Russo is unable to practice regular hand hygiene, ensure surfaces are regularly cleaned with EPA approved disinfectants, and effectively socially distance. For a high-risk individual such as Mr. Russo, this virus is more likely to be fatal; these safety measures are a necessity and could be life-saving. Furthermore, the MCC has an established record, predating this global pandemic, of insufficient provision of medical care. Correctional facilities such as the MCC are ill-equipped to prevent the spread of COVID-19, and continually have staff and new arrestees entering the facility, who may themselves be carrying the virus. *See* Exhibit B.

### V. Conclusion

For the foregoing reasons, Mr. Russo respectfully requests that the Court modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) and release him to home detention, order his referral

---

[15] https://www.cnbc.com/2020/03/24/coronavirus-new-york-city-to-release-300-nonviolent-inmates-from-rikers-island.html
[16] https://www.dailynews.com/2020/03/24/l-a-county-releases-1700-inmates-from-jail-early-to-prevent-coronavirus-outbreak-behind-bars/
[17] https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html

to a halfway house, or hold a hearing as soon as possible. Should the Court wish to hold a hearing, counsel waives Mr. Russo's appearance and asks that Mr. Russo be allowed to appear telephonically.

                                                Respectfully Submitted,

                                                /s/
                                                Robert Baum
                                                Assistant Federal Defender
                                                Federal Defenders of New York, Inc.
                                                Robert_Baum@fd.org

cc: AUSA Catherine Gosh