

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 31, 2020

**VIA EMAIL**

The Honorable Lewis J. Liman
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

RE: *United States v. Robert Russo*,
     16 Cr. 441 (LJL)

Dear Judge Liman:

    The Government respectfully submits the following in opposition to the motion of defendant Robert Russo which seeks release from his custodial term on the basis of "extraordinary and compelling reasons," namely the recent COVID-19 outbreak. *See* 18 U.S.C. § 3582(c)(1)(A)(i). Because the defendant, by his own admission, has failed to comply with the statute's mandatory administrative exhaustion requirement, the motion should be denied without prejudice to a future motion if his application for relief is denied by the BOP. In the alternative, if the court is inclined to release Russo notwithstanding his failure to exhaust administrative remedies, it should do so only on conditions that ensure that he is better protected from COVID-19 and that the risk to public safety (including of the spread of COVID-19 and of future crimes posed by Russo) is minimized.

    **A. Background**

    Russo is a prolific taxi cab robber and con artist. As the Honorable Deborah A. Batts noted at sentencing, the defendant "is a 63-year-old man whose life of crime started at the age of 16. He is a predator on livery cab and taxi drivers, whether by use of violence, use of fraud, or theft of services." (Sentencing Tr. at 27:13-16.) The defendant committed most of his crimes in the same way: he would attempt to scam taxi and livery drivers out of money, and in some cases when that failed he resorted to robbery. At the time of his sentencing, he had 37 convictions between the ages of 16 and 59, and had previously been sentenced to several lengthy terms of imprisonment including 54 months to nine years in 1988 (at the age of 33) for first degree robbery; 150 months in 1997 (at the age of 41) for first degree robbery; and 30 months to five years in 2012 (at the age of 56) for third degree robbery. He also had numerous shorter sentences for such crimes as intent to obtain transportation without paying, fraudulent accosting, and petit larceny.

    The defendant pled guilty to conspiracy to commit Hobbs Act robbery after a May 30, 2016 robbery of a New York taxi cab driver. On October 16, 2018, Judge Batts sentenced the defendant to the statutory maximum term of 60 months' imprisonment to be followed by three years'

supervised release.  The defendant, who is serving his sentence at the Metropolitan Correctional Center ("MCC"), is presently scheduled to be released on October 6, 2020.

In the instant motion, the defendant contends that the COVID-19 pandemic presents "extraordinary and compelling reasons" warranting his immediate release to either home detention or a halfway house.  Specifically, the defendant, who is now 64, cites his age and a series of medical issues as warranting early release.  The defendant filed the instant motion on March 30, 2020, and states that "[o]n March 27, 2020, counsel transmitted Mr. Russo's request to the warden of MCC via email," but the Bureau of Prisons has yet to rule on his request and "thirty days have yet to pass."  (Motion at 3.)  As of the Government's filing of this letter, the BOP has not yet acted on the administrative relief request which, as noted, it received only a few days ago.

### B. <u>Applicable Law</u>

The district court may modify a term of imprisonment previously imposed if "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). But it only may do so upon a motion of the BOP or upon a motion of the defendant, in the latter case provided that "the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." *Id.*  Several court of appeals have held that the requirements of Section 3582(c) constitute a jurisdictional bar preventing a district court from granting relief unless satisfied. *See United States v. Monzon*, No. 99 Cr. 157 (DLC), 2020 WL 550220, at *2 (S.D.N.Y. Feb. 4, 2020) (collecting cases). And while the Second Circuit has not decided the question, it has made clear that as a general matter courts are "required to strictly enforce statutory exhaustion requirements." *Theodoropoulous v. I.N.S.*, 358 F.3d 162, 172 (2d Cir. 2004). As the court in *Monzon* recently explained, "'[j]udge-made exhaustion doctrines, even if flatly stated at first, remain amenable to judge-made exceptions.' When Congress includes administrative exhaustion in the relevant statute, by contrast, 'courts have a role in creating exceptions only if Congress wants them to.'" *Monzon*, 2020 WL 550220, at *1 (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016)).  This Court therefore "cannot grant [the] motion for sentence reduction" at this time. *Id.* at *2; *see also* 18 U.S.C. § 3582(c) (absent exhaustion of administrative remedies, a court "*may not* modify a term of imprisonment") (emphasis added).

Consistent with that guidance, courts in the Second Circuit have denied Section 3582(c) claims brought by defendants who have failed to exhaust their administrative rights under the statute. *See, e.g.*, *United States v. Hernandez*, 19 Cr. 834 (PAE), 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020) (finding that the compassionate release provisions of the First Step Act did not apply because "Mr. Hernandez does not appear to have sought any [ ] relief within the Bureau of Prisons, let alone exhausted his administrative remedies"); *United States v. Gileno*, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020) (denying motion for modification of sentence based on COVID-19 concerns "without prejudice to renewal" after exhaustion of remedies); *United States v. Bolino*, 2020 WL 32461, at *2 (E.D.N.Y. Jan. 2, 2020) (denying motion for compassionate release without prejudice to renewal after exhaustion of administrative remedies).

### C. <u>Discussion</u>

#### 1. The Court Should Require Exhaustion of Administrative Remedies

The defendant cites no authority permitting waiver of the exhaustion requirement under Section 3582(c). Instead, he relies either on cases interpreting different statutes, *see, e.g.*, *Washington v. Barr*, 925 F.3d 109, 114 (2d Cir. 2019) (Controlled Substances Act); *Bowen v. City of New York*, 476 U.S. 467 (1986) (Social Security Act), *Maxwell v. New York Univ.*, 407 F. App'x 524, 527 (2d Cir. 2010) (Military Selective Service Act), or cases which, though relying on Section 3582(c), are silent on the issue of exhaustion of administrative remedies: In *United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT), ECF Docket No. 642 (D. Mass. Mar. 17, 2020), the court granted the requested two-week reduction of the five-month sentence originally imposed, resulting in a sentence of time-served. However, the court's one paragraph order (which was based on sealed briefing) contained no discussion of the exhaustion requirement or any indication as to whether or not administrative remedies had been exhausted. Similarly, in *United States v. James Arberry*, No. 15 Cr. 594 (JPO), ECF Docket No. 84 (S.D.N.Y. Nov. 12, 2019), the court granted, upon the Government's consent, immediate release of the defendant from the halfway house where he was completing his sentence because he was likely to die from advanced cancer in the next two weeks. The court's one-page order did not analyze the exhaustion requirement. The Government respectfully submits that the authority described in Section B above, from courts in this District which analyzed this exact issue, reached the correct conclusion – this Court lacks the authority to modify the defendant's sentence until administrative remedies are exhausted. *See, e.g.*, *Hernandez*, 2020 WL 1445851, at *1 ("Having canvassed potential sources of legal authority, the Court concludes that it lacks the legal authority to thus modify his sentence"); *Monzon*, 2020 WL 550220.

Moreover, even assuming the Court had discretion to waive the administrative exhaustion requirement, there are sound reasons to require the defendant to nonetheless comply with that requirement and pursue a BOP review of his case, particularly where, as here, the defendant seeks to rely on factual claims about his health and conditions of confinement as to which there is presently no record developed.[1] Indeed, the BOP is uniquely positioned to assess and provide the Court with detailed information about the defendant's present health condition, his behavior since being incarcerated, his recidivism score, the conditions of confinement at MCC, and the relative merits of the defendant's claim as opposed to the many, many others being made by similarly situated defendants at MCC and across the country.

---

[1] The defendant submits two exhibits in support of his motion: (1) an affidavit of Brie Williams, M.D., which Dr. Williams wrote "in support of any defendant seeking release from custody during the COVID-19 pandemic, so long as such release does not jeopardize public safety and the inmate can be released to a residence in which the inmate can comply with CDC social distancing guidelines" (Exhibit A ¶ 4); and (2) a declaration of Jonathan Giftos, M.D., submitted in an Eastern District of New York case concerning conditions at the Metropolitan Detention Center (MDC) in Brooklyn (Exhibit B). Neither contains any information specific to Russo or his confinement at MCC.

To be sure, the COVID-19 pandemic warrants serious attention. But the defendant has offered no evidence to suggest the BOP is not taking the pandemic seriously or will not meaningfully consider his administrative request. To the contrary, the BOP has made significant efforts to respond. In particular, since at least October 2012, BOP has had a Pandemic Influenza Plan in place. *See* BOP Health Management Resources, available at https://www.bop.gov/resources/health_care_mngmt.jsp. Moreover, beginning approximately two months ago, in January 2020, BOP began to plan specifically for coronavirus/COVID-19 to ensure the health and safety of inmates and BOP personnel. *See* Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. As part of its Phase One response to coronavirus/COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id.* In addition, BOP stood up "an agency task force" to study and coordinate its response to coronavirus/COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President. BOP's planning is structured using the Incident Command System (ICS) framework." *Id.*

On Friday, March 13, 2020, BOP, after coordination with DOJ and the White House, implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id.* These national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.* For example, BOP (a) suspended social visits for 30 days (but increased inmates access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmate movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id.* In addition, BOP has implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by its infectious disease management programs. *Id.* As part of BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.* All of these steps belie any suggestion that BOP is failing to meaningfully address the risks posed by COVID-19 or take seriously the threat the pandemic poses to current inmates.

In sum, because the defendant has failed to comply with the statute's mandatory requirement that he first permit the BOP to review and act upon his application, the instant motion should be denied. Moreover, even assuming the Court had jurisdiction to evaluate the merits of the defendant's Section 3582(c) claim at this time, the Government respectfully submits that it would be prudent to allow the review process currently underway at the BOP to continue, a process

which is likely to generate information useful to the Government and the Court in evaluating the motion, should the BOP deny the request.

### 2. In the Alternative, Conditions of Release Must Ensure the Safety of Russo and the Public

In the alternative, if the Court is inclined to release Russo, it should do so only if the release conditions ensure he will be better protected from COVID-19 when released than while incarcerated. The Court should also release Russo only under conditions that minimize the risks to public safety – including both the risk of the spread of COVID-19 and the risk of future crimes committed by Russo, who has returned to crime after each of his prior 37 convictions. For example, if the defendant is released to home confinement, GPS monitoring should be used to prevent the defendant from committing additional crimes (or enable detection if he does commit such crimes). Additionally, all conditions of release, such as electronic monitoring or suitable halfway house placement, should be in place before the defendant's release.

The Government and counsel for the defendant have met and conferred regarding the defendant's motion. While the parties do not agree on the necessity of administrative exhaustion, they are in agreement that, should the Court order the defendant's release, a halfway house is preferable to home confinement (given that the defendant would reside with his elderly mother if released home and his potential exposure while at MCC could pose a danger to her health).

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

by: _____s/_____
Catherine E. Ghosh
Assistant United States Attorney
(212) 637-1114

cc:    Robert Baum, Esq. (via email)